**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

CBRE, INC.,

       Plaintiff,

v.

CAPITAL COMMERCIAL REAL ESTATE
GROUP, INC.

       Defendant.

**Case No. 19-cv-61235-RAR**

**CBRE'S MOTION FOR PRELIMINARY INJUNCTION**
**<u>AGAINST CAPITAL COMMERCIAL REAL ESTATE GROUP</u>**

i

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................... 1

II.     STATEMENT OF FACTS ...................................................................................... 2

III.    LEGAL STANDARD .............................................................................................. 7

IV.     ARGUMENT ........................................................................................................... 8

   A.   CBRE is Likely to Succeed on the Merits of its Claims ....................................... 8

   1.   Trademark Infringement and Unfair Competition (15 U.S.C. § 114) ................. 8

   i.   Type (Strength) of the Mark ................................................................................ 10

   ii.  Similarity of the Marks ....................................................................................... 11

   iii. Similarity of the Services .................................................................................... 13

   iv.  Similarity of Sales Methods and Advertising Channels ..................................... 13

   v.   Defendant's Intent ................................................................................................ 14

   vi.  Evidence of Actual Confusion ............................................................................. 15

   2.   Cybersquatting Claim (15 U.S.C. § 1125(d)) ..................................................... 16

   B.   CBRE Will Suffer Irreparable Harm in the Absence of Injunctive Relief ........... 16

   C.   The Harm to Capital Commercial, if Any, is Decidedly Outweighed by Harm to CBRE 18

   D.   The Public Interest Favors Preliminary Injunction .............................................. 20

V.      CONCLUSION ...................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*America's Health Ins. Plans v. Hudgens*,
  742 F.3d 1319 (11th Cir. 2014) ..............................................................................7

*Angel Flight of Ga. v. Angel Flight Am., Inc.*,
  522 F.3d 1200 (11th Cir. 2008) ............................................................................20

*Babbit Elecs., Inc. v. Dynascan Corp.*,
  38 F.3d 1161 (11th Cir.1994) ...........................................................................8, 14

*Bavaro Palace, S.A. v. Vacation Tours, Inc.*,
  203 Fed. App'x 252 (11th Cir. 2006) ...................................................................16

*Boulan S. Beach Master Ass'n, Inc. v. Think Properties, LLC*,
  617 F. App'x 931 (11th Cir. 2015) ..................................................................16, 17

*Corning Glass Works v. Jeannette Glass Co.*,
  308 F.Supp. 1321 (S.D.N.Y. 1970) ......................................................................19

*Custom Mfg. & Eng'g, Inc. v. Midway Servs., Inc.*,
  508 F.3d 641 (11th Cir. 2007) ................................................................................9

*Davidoff & Cie, S.A. v. PLD Int'l Corp.*,
  263 F.3d 1297 (11th Cir. 2001) ............................................................................20

*E. Remy Martin & Co., S.A. v. Shaw–Ross Int'l Imports, Inc.*,
  756 F.2d 1525 (11th Cir. 1985) ..............................................................11, 12, 19

*Evans v. Andy & Evan Indus., Inc.*,
  No. 15-61013-CV, 2016 WL 7496188 (S.D. Fla. Jan. 6, 2016) ............................17

*Ferrellqas Ptnrs., L.P. v. Barrow*,
  143 Fed. Appx. (11th Cir. 2005)......................................................................16, 17

*Freedom Sav. and Loan Ass'n v. Way*,
  757 F.2d 1176 (11th Cir. 1985) ............................................................................10

*Frehling Enterprises, Inc. v. Int'l Select Grp., Inc.*,
  192 F.3d 1330 (11th Cir. 1999) .................................................................. *passim*

*Gaffigan v. Does*,
  689 F.Supp.2d 1332 (S.D. Fla. 2009) ...................................................................19

*Intec, Inc. v. Monster Cable Prod., Inc.*,
   No. 10-22772-CIV, 2011 WL 13223537 (S.D. Fla. Sept. 6, 2011) ..............................9, 17, 18

*It's A 10, Inc. v. Beauty Elite Grp., Inc.*,
   932 F. Supp. 2d 1325 (S.D. Fla. 2013) ...........................................................................15, 18

*John H. Harland Co. v. Clarke Checks, Inc.*,
   711 F.2d 966 (11th Cir. 1983) ....................................................................................13

*Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*,
   51 F.3d 982 (11th Cir. 1995) ....................................................................................7, 8

*Lone Star Steakhouse & Saloon v. Longhorn Steaks*,
   106 F.3d 355 (11th Cir. 1997) ....................................................................................8

*Nailtiques Cosmetic Corp. v. Salon Scis., Corp.*,
   No. 96-2709-CIV-NESBITT, 1997 WL 244746 (S.D. Fla. Jan. 10, 1997) ...........................20

*Rain Bird Corp. v. Taylor*
   665 F.Supp.2d 1258 (N.D. Fla. 2009) ...........................................................................8

*Ryder Sys., Inc. v. Storage & Moving Servs., Inc.*,
   No. 13-61466-CIV, 2013 WL 3873231 (S.D. Fla. July 25, 2013) ...................................17, 18

*S.A.S. Jean Cassegrain v. Accessoiresnet.info*,
   No. 17-61593-CIV, 2017 WL 10742772 (S.D. Fla. Aug. 25, 2017) ......................................16

*SunAmerica Corp. v. Sun Life Assurance Co. of Can.*,
   77 F.3d 1325 (11th Cir. 1996) ....................................................................................14

*Suzuki Motor Corp. v. Jiujiang Hison Motor Boat Mfg. Co.*,
   No. 1:12-CV-20626, 2012 WL 640700 (S.D. Fla. Feb. 27, 2012) .................................. *passim*

*Tally-Ho, Inc. v. Coast Cmty. Coll. Dist.*,
   889 F.2d 1018 (11th Cir. 1989) ....................................................................................9, 19

*Tancogne v. Tomjai Enterprises Corp.*,
   408 F. Supp. 2d 1237 (S.D. Fla. 2005) ...................................................................12, 14, 15

*TracFone Wireless, Inc. v. Clear Choice Connections, Inc.*,
   102 F. Supp. 3d 1321, 1332-33 (S.D. Fla. 2015) ...................................................................17

*Turner Greenberg Assocs., Inc. v. C & C Imports, Inc.*,
   320 F. Supp. 2d 1317 (S.D. Fla. 2004), *aff'd*, 128 F. App'x 755 (11th Cir.
   2005) ....................................................................................14

## Statutes

15 U.S.C. § 114 ....................................................................................8

15 U.S.C. § 1058 ............................................................................................................................ 9

15 U.S.C. § 1065 ....................................................................................................................... 3, 10

15 U.S.C. § 1125(d) ..................................................................................................................... 16

Lanham Act ................................................................................................................................... 11

## I.       INTRODUCTION

Plaintiff CBRE, Inc. ("CBRE") seeks an order preliminarily enjoining Defendant Capital Commercial Real Estate Group, Inc. ("Capital Commercial") from ongoing trademark infringement and related infringement, unfair competition, and cybersquatting.

CBRE is the largest commercial real estate services company in the world with over $21 billion in 2018 revenue alone. Since at least 2003, it has offered its real estate and related services throughout the United States and Florida under a distinctive logo that includes capital, block, stylized "CBRE" letters and a green and white color scheme. The stylized "CBRE" letters are protected by federally registered United States trademarks which have now become incontestable. CBRE has for years enjoyed unfettered rights to offer its best-in-class real estate services throughout the United States under its distinctive logo and marks. It spends millions of dollars each year advertising and promoting those services.

After offering commercial real estate services in South Florida for over a decade using a website and marketing materials very different from CBRE's, Defendant Capital Commercial recently refashioned its website, domain name, and marketing materials to nearly mirror CBRE's. Indeed, Capital Commercial's new logo includes the letters "CCRE" or "CCREG" that use the same capitalized, block letters, font, and color scheme as CBRE's logo:

| CBRE Logo | New Capital Commercial Logo |
|---|---|
|  | |

Injunctive relief is appropriate here because Capital Commercial's new logo—which pervades its website and marketing materials—is likely to confuse consumers about the source of

Capital Commercial's services and suggest an affiliation between CBRE and Capital Commercial where none exists. CBRE's logo is strong under both federal and common law trademark laws, and Capital Commercial's new logo is nearly identical. The parties are direct competitors, offering identical services in the same geographic regions. Each company advertises and promotes its services through the same marketing channels. And, importantly, the circumstantial evidence suggests that Capital Commercial copied CBRE's logo to exploit CBRE's reputation and goodwill.

CBRE does not request this relief lightly. Absent injunctive relief, Capital Commercial's infringing activities will irreparably harm CBRE in that prospective or actual customers will believe that Capital Commercial's services are affiliated with CBRE. Evidence suggests that Capital Commercial offers inferior services and is soliciting real estate brokers to join its team through ads imbued with its infringing logo, proclaiming that it is "the industry leader" when, in reality, it is not. These deceitful activities inflict innumerable harm to the reputation and goodwill that CBRE has spent years and hundreds of millions of dollars accruing. Monetary damages alone are insufficient to make CBRE whole.

Accordingly, CBRE respectfully requests that this Court issue a preliminary injunction to stop Capital Commercial's ongoing infringement and related activities as described below.

## II.    STATEMENT OF FACTS

1.      CBRE is the largest commercial real estate services company in the world with over $21 billion in 2018 revenue, ranking #146 on the 2019 Fortune 500 list. CBRE is a wholly-owned subsidiary and the U.S. operating arm of CBRE Group, Inc. *See* Declaration of Scott Correale ("Correale Decl."), ¶¶ 2-3; Declaration of Mark D. Schafer ("Schafer Decl."), ¶ 3.

2.      CBRE's services include the acquisition, sale, and leasing of commercial properties and land, including apartment buildings, small businesses, hotels and motels, office buildings,

shopping centers, and warehouses. *See* Correale Decl., ¶ 4. On information and belief, Capital Commercial offers these same services. *See* Schafer Decl., ¶ 4.

3.      In 2018 alone, CBRE was responsible for more than $380 billion of property sales and lease transactions, and currently manages more than 6.1 billion square feet of commercial properties and corporate facilities throughout the U.S. *See* Correale Decl., ¶ 5; Schafer Decl., ¶ 3.

4.      CBRE owns numerous trademark registrations, including U.S. Registration Nos. 4,161,000, 2,925,943, and 2,925,952 (collectively, "the CBRE Registrations"). *See* Schafer Decl., ¶ 5; ECF No. 1, CBRE's Complaint Against Capital Commercial ("Compl."), ¶ 10.

5.      These registrations remain in full force and effect. They have each become incontestable under 15 U.S.C. § 1065. *See* Schafer Decl., ¶ 6.

6.      Since at least 2003, CBRE adopted and has used in commerce in the United States and throughout Florida a unique and distinctive logo for its real estate and financial services that combines the following elements: (1) the capital letters "CBRE" in the distinctive stylized form covered by its U.S. Trademark Registration No. 4,161,000; and (2) dark green letters against a white background (or vice versa) (collectively, "the CBRE Mark"). *See* Correale Decl., ¶ 6; Compl. ¶¶ 12-14.

7.      CBRE has used the domain name "cbre.us" in connection with its real estate and financial services since July 25, 2010. CBRE markets these services in each county in Florida, including via the Twitter handle "@cbre_Florida." *See* Correale Decl., ¶¶ 7-9; Schafer Decl., ¶ 7.

8.      During the prior three-year period, CBRE spent over $200 million advertising and promoting its real estate and financial services, wherein all of its promotional and advertising materials bore the CBRE Mark. *See* Correale Decl., ¶ 10; Schafer Decl., ¶ 8.

3

9.      Lipsey—a renowned training and consulting firm in the commercial real estate industry—recently ranked CBRE as the top real estate brand for an eighteenth consecutive year. *See* Schafer Decl., ¶ 9; Compl., ¶ 8.

10.     Defendant Capital Commercial Real Estate Group, Inc. ("Capital Commercial") purports to be a leader in marketing commercial real estate and businesses in South Florida. *See* Schafer Decl. ¶ 10. On information and belief, for over a decade, Capital Commercial used the domain name "capitalcomgroup.com" to direct customers to the homepage of its website, which displayed the name "Capital Commercial Real Estate Group" in white lettering against a blue background with images of skyscrapers. *See* Schafer Decl. ¶ 11-13; Compl., ¶ 16.

11.     Both CBRE and Capital Commercial list property for sale and lease on their respective company websites, and both utilize brokers to facilitate these transactions. *See* Correale Decl., ¶ 11; Schafer Decl. ¶ 10. Capital Commercial represents on its website that it advertises in newspapers, magazines, business journals, and many "important websites." *See* Schafer Decl. ¶ 10. Capital Commercial's homepage includes links to several social media outlets, including Facebook, Twitter, and Linkedin, and lists "info@ccreflorida.com" as contact information. Capital Commercial also uses direct mail, pamphlets, signage, and brochures to advertise its real estate services in South Florida. *See* Schafer Decl. ¶¶ 10, 14. Aside from newspaper, CBRE uses all of these same advertising channels throughout Florida. Correale Decl., ¶ 12.

12.     Capital Commercial recently changed its domain name to "ccreflorida.com" and incorporated into its website and marketing materials logos bearing capital white "CCRE" letters against a dark green background and capital dark green "CCRE" letters against a white background (collectively, "the new Capital Commercial logos" or "the new Capital Commercial marks"). Compl., ¶¶ 17-18.

4

13.     The new Capital Commercial logos are featured prominently throughout Capital Commercial's website, in print and online advertisements and signage, and in employment solicitations for real estate agents. Capital Commercial's website layout is also very similar to the layout of CBRE's website. As Capital Commercial acknowledges, "[b]y utilizing the many marketing sources, we are able to give our listings exposure to the mass market…reaching the majority of potential buyers." *See* Schafer Decl., ¶¶ 10, 14, 15; Compl., ¶¶ 18-19.

14.     A Google search for Capital Commercial reveals negative reviews in connection with its real estate services. *See, e.g.*, Schafer Decl., ¶ 16.

15.     Capital Commercial has disseminated by direct email numerous solicitations for commercial brokers, including claims that brokers can earn "6 figure[]" salaries by "becom[ing] a commercial specialist" and "learn[ing] investment real estate brokerage from the industry leader," directing broker candidates to visit its "ccreflorida.com" website. These solicitations were independently received by numerous CBRE brokers who expressed concern about the potential for market confusion. *See* Correale Decl., ¶ 13.

16.     CBRE does not solicit real estate brokers through direct mail or direct email, and CBRE has not authorized any third party to use the CBRE Mark and is unaware of any other unlicensed third parties offering products or services under the CBRE Mark or any similar mark. *See* Correale Decl., ¶¶ 14-15.

17.     CBRE and Capital Commercial have no affiliation or business association. *See* Correale Decl., ¶ 16.

18.     On February 7, 2019, CBRE's Deputy General Counsel sent a letter to Randy North—Capital Commercial's President, CEO, and registered agent—demanding that Capital Commercial cease its infringing activities, including refraining from using the new Capital

5

Commercial logo and new "ccreflorida.com" domain name. In its letter, CBRE identified and attached the U.S. Trademark Registration No. 4,161,000. Capital Commercial did not respond. *See* Schafer Decl., ¶ 17.

19.     Accordingly, CBRE's outside counsel followed up with Capital Commercial on April 3, 2019, with another letter to Mr. North. In this letter, CBRE identified and attached the CBRE Mark and once again demanded that Capital Commercial cease its infringing activities— including use of its new logo and the "ccreflorida.com" domain name—placing Capital Commercial on notice of CBRE's federal and state law claims for trademark infringement, trade dress infringement, and unfair competition. CBRE requested a response no later than April 16, 2019. *See* Schafer Decl., ¶ 18.

20.     Instead of responding or ceasing its infringing activities, Capital Commercial altered its new website logo to read "CCREG"—utilizing the same font and green and white color scheme—shortly after CBRE sent the April 3, 2019 letter. *See* Schafer Decl., ¶ 19.

21.     CBRE filed suit against Capital Commercial on May 15, 2019, alleging federal and common law trademark infringement; federal and common law trade dress infringement; false designation of origin of services; cybersquatting; common law unfair competition; and deceptive and unfair trade practices under Florida statutory law. *See generally* Compl. (ECF No. 1).

22.     On May 16, 2019, counsel for CBRE again reached out to Mr. North alerting him of the lawsuit and demanding that Capital Commercial cease its infringing activities. CBRE made explicit that Capital Commercial's addition of a "G" onto the end of its logo is insufficient given the remaining elements that closely resemble CBRE's logo. *See* Schafer Decl., ¶ 20.

23.     After changing its website url from "ccreflorida.com" to "ccreg.us," but retaining its logo and website design, Mr. North responded on May 30, 2019, stating: "I think Capital

6

Commercial complied with your demands…." *See* Schafer Decl., ¶ 21. The same day, counsel for CBRE responded that Capital Commercial has taken very little remedial action and that its ongoing infringement persists, explicitly setting forth the actions Capital Commercial must take to prevent its ongoing infringement. *See* Schafer Decl., ¶ 21. Mr. North simply replied: "Will do." Schafer Decl., ¶ 21. Capital Commercial took no further remedial measures.

24.     On June 5, 2019, CBRE's counsel emailed Mr. North documents that had been filed in the lawsuit. In response, Mr. North replied that he is "shocked that [CBRE] is taking more action against our tiny company/office," accusing CBRE of "ha[ving] something against Jewish business people." *See* Schafer Decl., ¶ 22.

25.     On June 12, 2019, CBRE's counsel responded to Mr. North, stating that "CBRE is not targeting you or your company," but is rather being "diligent in protecting its trademarks and related intellectual property rights." CBRE expressed its ongoing willingness to resolve the matter if Capital Commercial changed its confusingly similar logo, url, website, and marketing materials. *See* Schafer Decl., ¶ 22. Mr. North's response made clear that Capital Commercial did not intend to take further action. *Id*.

## III.     LEGAL STANDARD

"To support a preliminary injunction, a district court need not find that the evidence positively guarantees a final verdict in plaintiff's favor." *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 985 (11th Cir. 1995). Rather, the movant must show: "(1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *America's Health Ins. Plans v. Hudgens*, 742 F.3d 1319, 1329 (11th Cir. 2014) (citations

omitted). At the preliminary injunction stage, the Court may rely on "affidavits and hearsay materials which would not be admissible evidence for a permanent injunction, if the evidence is appropriate given the character and objectives of the injunctive proceeding." *Levi Strauss & Co.*, 51 F.3d at 985 (citations omitted).

## IV.    ARGUMENT

### A.  CBRE is Likely to Succeed on the Merits of its Claims

#### 1.   Trademark Infringement and Unfair Competition (15 U.S.C. § 114)

To demonstrate that claims for federal and common law trademark infringement are likely to succeed on the merits, the Plaintiff must show (1) that its mark has priority and (2) that defendant's use of its mark is likely to cause consumer confusion. *See Lone Star Steakhouse & Saloon v. Longhorn Steaks*, 106 F.3d 355, 358 (11th Cir. 1997); *Rain Bird Corp. v. Taylor* 665 F.Supp.2d 1258, 1267 (N.D. Fla. 2009) ("[T]he legal standards for Florida statutory and common law claims of trademark infringement and unfair competition . . . are the same as those for federal claims of trademark infringement and unfair competition"). To prevail on its unfair competition claims, the Plaintiff must also demonstrate a likelihood of confusion. *See Babbit Elecs., Inc. v. Dynascan Corp.*, 38 F.3d 1161, 1181 (11th Cir.1994). To determine whether a likelihood of consumer confusion exists, the Eleventh Circuit evaluates the following seven factors: (1) type or strength of the plaintiff's mark; (2) similarity of the parties' marks; (3) similarity of products the marks represent; (4) similarity of the parties' trade channels and customers; (5) similarity of advertising media; (6) the defendant's intent; and (7) evidence of actual confusion in the marketplace. *See Frehling Enterprises, Inc. v. Int'l Select Grp., Inc.*, 192 F.3d 1330, 1335 (11th Cir. 1999). Of these factors, the type or strength of the plaintiff's mark and evidence of actual confusion are considered the most important. *Id.* However, "[b]ecause the bottom line is the likelihood of confusion, application of the *Frehling* factors entails more than the mechanistic

summation of the number of factors on each side; it involves an evaluation of the 'overall balance.'" *Custom Mfg. & Eng'g, Inc. v. Midway Servs., Inc.*, 508 F.3d 641, 649 (11th Cir. 2007).

CBRE's priority in the CBRE Mark is indisputable. CBRE has three registrations covering the letters "CBRE," including those letters in the stylized form displayed by the CBRE Mark. *See* CBRE's Statement of Facts ("SOF"), ¶ 4. Its registrations are "prima facie evidence of both the validity of the mark and of Plaintiff's ownership." *Intec, Inc. v. Monster Cable Prod., Inc.*, No. 10-22772-CIV, 2011 WL 13223537, at *2 (S.D. Fla. Sept. 6, 2011) (citing 15 U.S.C. § 1507(b)). These registrations have also become incontestable under 15 U.S.C. §§ 1058 and 1065 (SOF, ¶ 5), and "[i]ncontestability firmly establishes the validity of those trademarks and [CBRE's] exclusive rights in them." *Suzuki Motor Corp. v. Jiujiang Hison Motor Boat Mfg. Co.*, No. 1:12-CV-20626, 2012 WL 640700, at *1 (S.D. Fla. Feb. 27, 2012). CBRE has adopted and continually used the stylized CBRE Mark, including the green and white color schemes, in United States commerce in connection with a wide-ranging assortment of real estate and financial services since at least 2003, including services throughout Florida. *See* SOF at ¶ 6. Conversely, Capital Commercial just recently began using its new mark in connection with real estate services in South Florida. SOF, ¶¶ 10, 12-13. In view of CBRE's actual and continuous use of the CBRE Mark for many years predating Capital Commercial's use of its new mark, CBRE is the senior user and enjoys priority in the CBRE Mark throughout Florida. *See Tally-Ho, Inc. v. Coast Cmty. Coll. Dist.*, 889 F.2d 1018, 1022 (11th Cir. 1989) ("The first to use a mark on a product or service in a particular geographic market, the senior user, acquires rights in the mark in that market.").

Accordingly, the only consideration for this Court is whether Capital Commercial's use of its new mark in connection with real estate services is likely to cause consumer confusion. The *Frehling* factors weigh heavily in favor of a finding that consumer confusion is likely.

### i. Type (Strength) of the Mark

This factor—considered to be the most important—requires the Court to classify Plaintiff's mark as strong or weak. *See Frehling*, 192 F.3d at 1335. In analyzing the strength of mark, the Court must first determine the category of distinction the mark belongs to. *Id.* at 1335-36. There are four categories of marks: (a) generic; (b) descriptive; (c) suggestive; and (d) arbitrary. *Id.* at 1335. These categories are based on the relationship between the mark and the nature of the services it identifies. *Id.* An arbitrary mark "is a word or phrase that bears no relationship to the product" or service it identifies, and is thus "the strongest of the four categories." *Id.* at 1335-36.

Also important is assessing the nature and extent of any third party use of the mark. *Id.* at 1336. "The less that third parties use the mark, the stronger it is, and the more protection it deserves." *Id.* (citation omitted).

Finally, courts assess whether the mark has been made incontestable through the procedures set forth in 15 U.S.C. § 1065. *Id.* Once the United States Patent and Trademark Office has declared a mark incontestable, "then the mark's incontestability serves to enhance its strength." *Id.*

The CBRE Mark is an arbitrary mark that is afforded the highest degree of protection. CBRE offers a wide array of real estate and financial services for which the CBRE Mark offers no descriptive, or even suggestive, information. Accordingly, the CBRE Mark bears no relation to the services it identifies. Even in instances where the type of service provided was included in the mark, the Eleventh Circuit has found the mark to be arbitrary. *See Freedom Sav. and Loan Ass'n v. Way*, 757 F.2d 1176, (11th Cir. 1985) (establishing "Sun Bank" as an arbitrary mark when viewed in relation to banking services). The CBRE Mark is thus highly distinctive and entitled to the greatest degree of protection.

The lack of third-party use also weighs in favor of finding that the CBRE Mark is strong. *Frehling*, 192 F.3d at 1336. CBRE has not authorized any third party to use the CBRE Mark and is unaware of any other unlicensed third parties offering products or services under the CBRE Mark or any similar mark. *See* SOF, ¶ 16.

Finally, as described above, the stylized CBRE Mark has become incontestable. This serves to further enhance the strength of the CBRE Mark. *See Frehling*, 192 F.3d at 1336.

Taken together, these facts demonstrate that the CBRE Mark is a strong one entitled to the greatest degree of protection afforded by the Lanham Act and common law. This factor clearly favors CBRE.

### ii. Similarity of the Marks

Under this factor, the Court must examine "the overall impression created by the marks, including a comparison of the appearance, sound and meaning of the marks, as well as the manner in which they are displayed." *E. Remy Martin & Co., S.A. v. Shaw–Ross Int'l Imports, Inc.*, 756 F.2d 1525, 1531 (11th Cir. 1985).

Here, there are remarkable similarities between the CBRE Mark and the new Capital Commercial logo. Capital Commercial's new logo employs an *identical* color scheme as the CBRE Mark—white lettering over a dark green background or dark green lettering over a white background. The focus of Capital Commercial's new logo is the four letters displayed in large, block, all capital letters in a substantially similar, if not identical, font as the stylized CBRE Mark. A consumer could easily confuse the 'bee' and 'cee' sounds if they were to hear a vocal reproduction because Capital Commercial's new logo is separated from the CBRE Mark by only a single phoneme. Indeed, "CCRE" (cee-cee-ar-e) mirrors, almost identically, the pronunciation of "CBRE" (cee-bee-ar-e). Capital Commercial also displays its new logo in similar locations on

11

its website and advertising/promotional materials as the website and advertising/promotional materials where CBRE displays the CBRE Mark. *See* SOF, ¶¶ 12-13.

That Capital Commercial recently added the letter "G" to its new logo to read "CCREG" is of little consequence to the broader inquiry. Likelihood of confusion cannot rest upon a piecewise dissection of a mark, but must be predicated on the mark as a whole. *See Tancogne v. Tomjai Enterprises Corp.*, 408 F. Supp. 2d 1237, 1247 (S.D. Fla. 2005). Adding a "G" to the end of Capital Commercial's new logo does not materially change the overall impression created by the mark, particularly since CBRE's parent company is CBRE Group, which shortens to "CBREG." (SOF, ¶ 1); *See Tancogne*, 408 F. Supp. 2d at 1247 (finding "Fair & Bright" to be extremely similar to "Fair & White," despite the different wording, given the similarities in fonts, color schemes, sounds, and placements of the respective marks on the respective products); *Frehling*, 192 F.3d at 1337 (reversing the district court's finding that the marks were dissimilar because the defendant's addition of words to the protected mark did little to change the overall impression created by the allegedly infringing mark).

Further, Capital Commercial's inclusion of its full entity name in near-microscopic detail under the "CCRE" or "CCREG" lettering is a similarly trivial difference. It is barely noticeable and, given the substantial similarity of the other features, "it is not so distinctive as to cause a consumer to examine carefully the printed marks and their differences." *E. Remy Martin & Co.*, 756 F.2d at 1531. Such minor differences will thus "have little impact on the consuming public." *Id.*

Finally, Capital Commercial's new domain names—"ccreg.us" and "ccreflorida.com"— are very similar to CBRE's "cbre.us." domain name. As described above, the change from "b" to "c" and the addition of "g" does not render "ccreg" dissimilar from CBRE's registered "cbre"

12

trademark. This is particularly true since both domains share the same ".us" country code top-level domain. Since CBRE has operated throughout Florida for many years, consumers would likely believe "ccreflorida.com" is affiliated with CBRE's Florida real estate services, particularly since CBRE operates webpages specific to its Florida offices and markets its Florida real estate services under the Twitter handle "@cbre_Florida." *See* SOF, ¶¶ 11-12, 23.

Accordingly, this factor weighs in favor of finding likelihood of confusion.

### iii.   Similarity of the Services

Under this factor, the Court must examine whether the parties' services "are the kind that the public attributes to a single source." *Frehling*, 192 F.3d at 1338. "The greater the similarity between the products and services, the greater the likelihood of confusion." *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 976 (11th Cir. 1983).

Here, CBRE and Capital Commercial are direct competitors that offer identical services in the same geographic region. These services include the acquisition, sale, and leasing of commercial properties and land, including apartment buildings, small businesses, hotels and motels, office buildings, shopping centers, and warehouses. *See* SOF, ¶ 2. This factor weighs heavily in favor of injunction.

### iv.   Similarity of Sales Methods and Advertising Channels

"A high degree of similarity between sales methods and use of the same advertising media increases the likelihood of confusion." *Suzuki*, 2012 WL 640700, at *3.

Here, there is near complete overlap in sales methods and advertising channels between CBRE and Capital Commercial. Both companies list property for sale and lease on their respective company websites, and both utilize brokers to facilitate these transactions. *See* SOF, ¶ 11. Capital Commercial represents on its website that it advertises in newspapers, magazines, business journals, and many "important websites." *Id.* Its homepage includes links to several social media

13

outlets, including Facebook, Twitter, and Linkedin, and lists "info@ccreflorida.com" as contact information. *Id.* Capital Commercial also uses direct mail, pamphlets, signage, and brochures to advertise its real estate services in South Florida. *Id.* Aside from newspaper, CBRE uses all of these same advertising channels throughout South Florida, including the Twitter handle "@cbre_Florida." *Id.*

The strong uniformity in advertising channels too weighs heavily in CBRE's favor.

### v. Defendant's Intent

When a defendant adopts a mark "with the intent of obtaining benefit from the plaintiff's business reputation, this fact alone may be sufficient to justify the inference that there is confusing similarity." *Turner Greenberg Assocs., Inc. v. C & C Imports, Inc.*, 320 F. Supp. 2d 1317, 1333 (S.D. Fla. 2004), *aff'd*, 128 F. App'x 755 (11th Cir. 2005); *see also Babbit Elecs., Inc.*, 38 F.3d at 1179 ("In fact, a likelihood of confusion can be found as a matter of law if the defendant intended to derive benefit from the plaintiffs trademark."). Bad intent can be demonstrated by either a showing of conscious intent, such as copying, or intentional blindness. *See Frehling*, 192 F.3d at 1340. Generally, "a second user of a mark has a duty to avoid confusion with a first user's mark." *SunAmerica Corp. v. Sun Life Assurance Co. of Can.*, 77 F.3d 1325, 1345 (11th Cir. 1996). At the preliminary injunction stage, bad intent is typically proven by circumstantial evidence. *See Tancogne*, 408 F. Supp. 2d at1249 (S.D. Fla. 2005) (citing *Jellibeans, Inc. v. Skating Clubs of Georgia, Inc.*, 716 F.2d 833, 843 (11th Cir. 1983)).

There is no doubt that Capital Commercial adopted a confusingly similar mark with the intent to exploit CBRE's business reputation and goodwill. The CBRE Mark has been considered synonymous with CBRE's best-in-class real estate services in the minds of real estate professionals and consumers throughout the US and Florida for many years. *See* SOF, ¶¶ 1, 3, 9 Capital Commercial operates exclusively in South Florida and recently scrapped its long-standing mark

and domain name to adopt a new mark and domain names strikingly similar to the CBRE Mark. Considering CBRE's well-established brand of real estate services offered under the CBRE Mark, and Capital Commercial's abrupt refashioning of its mark and domain name to imitate the CBRE Mark, "it is impossible to attribute these resemblances to mere coincidence." *Tancogne*, 408 F. Supp. 2d at 1247–48. The circumstantial evidence demonstrates Capital Commercial copied the CBRE Mark. *Id.*; *see also It's A 10, Inc. v. Beauty Elite Grp., Inc.*, 932 F. Supp. 2d 1325, 1332 (S.D. Fla. 2013) (finding circumstantial evidence of intentional copying based on the similarity of the marks and trade dress).

Further, after ignoring two letters sent by CBRE's counsel warning Capital Commercial to cease use of its infringing mark, Capital Commercial merely added a "G" to the end of the mark, retaining the same confusingly similar font and color scheme. *See* SOF, ¶¶ 18-20. Capital Commercial thus "had notice as to the strong similarity of the marks and hence was aware that they may be confused and yet continued to use [its newly-adopted mark]," which at least suggests "an improper intent through intentional blindness." *Frehling*, 192 F.3d at1340.

This factor weighs substantially in CBRE's favor.

### vi.  Evidence of Actual Confusion

While evidence of actual confusion may be some of the strongest evidence to show likelihood of confusion, it is "unnecessary to establish infringement because the test is only a likelihood of confusion." *Suzuki*, 2012 WL 640700, at *4. Since evidence of actual confusion is not a prerequisite, "it is up to individual courts to assess this factor in light of the particular facts of each case." *Frehling*, 192 F.3d at 1340.

Here, while CBRE has not yet adduced evidence of actual confusion—which is likely due to the recency in Capital Commercial's changed logo and website—the other factors overwhelmingly suggest that confusion is likely. Likelihood of confusion is all that is required at

this stage. *See Ferrellqas Ptnrs., L.P. v. Barrow*, 143 Fed. Appx., 180, 191 (11th Cir. 2005) (directing the district court to issue a preliminary injunction despite the lack of any actual confusion evidence, and citing *Montgomery v. Noga*, 168 F.3d 1282, 1302 (11th Cir. 1999) for the proposition that "actual confusion is not required to prove likelihood of confusion").

### 2.   Cybersquatting Claim (15 U.S.C. § 1125(d))

To prevail on a claim of cybersquatting pursuant to the Anticybersquatting Consumer Protection Act ("ACPA") (15 U.S.C. § 1125(d)), the plaintiff must prove that "(1) its Marks are distinctive or famous and entitled to protection; (2) the Defendant's domain names are identical or confusingly similar to [Plaintiff's Marks]; and (3) the Defendant[] registered or used the domain names with a bad faith intent to profit." *Bavaro Palace, S.A. v. Vacation Tours, Inc.*, 203 Fed. App'x 252, 256 (11th Cir. 2006).

For the reasons described above, CBRE has shown that the CBRE Mark is distinctive and entitled to strong protection, that the "ccreflorida.com" and "ccreg.us" domain names are confusingly similar to CBRE's "cbre.us" domain name, and Capital Commercial adopted these confusingly similar domain names in bad faith to profit from CBRE's goodwill. The Court should thus find a high likelihood that Capital Commercial has engaged in cybersquatting. *See S.A.S. Jean Cassegrain v. Accessoiresnet.info*, No. 17-61593-CIV, 2017 WL 10742772, at *4 (S.D. Fla. Aug. 25, 2017) (finding cybersquatting and issuing a preliminary injunction from defendant's use of a domain name that, while not identical, is confusingly similar to that of plaintiff's).

### B.   CBRE Will Suffer Irreparable Harm in the Absence of Injunctive Relief

Trademark actions are common venues for the issuance of preliminary injunctions. *Boulan S. Beach Master Ass'n, Inc. v. Think Properties, LLC*, 617 F. App'x 931, 934 (11th Cir. 2015). "This is so because a remedy at law for consumer confusion or reputational damage is ordinarily

inadequate, given the potential difficulty of proof of plaintiff's damages and the impairment of intangible values." *Id.* (citation omitted). "A plaintiff need not show that the infringer acted in such a way as to damage the reputation of the plaintiff. It is the loss of control of one's reputation by the adoption of a confusingly similar mark that supplies the substantial threat of irreparable harm." *Ferrellgas Partners, L.P.*, 143 F. App'x at 190. Indeed, the Eleventh Circuit continues to recognize that "a sufficiently strong showing of likelihood of confusion may by itself constitute a showing of a substantial threat of irreparable harm." *Boulan*, 617 F. App'x at 934 (quoting *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1310 (11th Cir.1998)); *see also Evans v. Andy & Evan Indus., Inc.*, No. 15-61013-CV, 2016 WL 7496188, at *2 (S.D. Fla. Jan. 6, 2016) (finding irreparable harm based on a strong showing of likelihood of confusion); *Ryder Sys., Inc. v. Storage & Moving Servs., Inc.*, No. 13-61466-CIV, 2013 WL 3873231, at *7 (S.D. Fla. July 25, 2013); *Suzuki*, 2012 WL 640700, at *5; *TracFone Wireless, Inc. v. Clear Choice Connections, Inc.*, 102 F. Supp. 3d 1321, 1332-33 (S.D. Fla. 2015); *Intec, Inc.*, 2011 WL 13223537, at *3.

As illustrated above, CBRE has made a strong showing that consumers are likely to falsely believe that Capital Commercial's real estate services originate from, or are affiliated with, CBRE. This alone suffices to show that CBRE will suffer irreparable harm in the absence of injunctive relief.

What's more, Capital Commercial has placed CBRE's goodwill and reputation in jeopardy through the use of its confusingly similar mark and domain name. Capital Commercial is a small fraction of the size of CBRE, and there is reason to believe Capital Commercial is offering inferior services under its confusingly similar mark. *See* SOF, ¶ 13 Moreover, Capital Commercial is flooding email inboxes of commercial brokers with solicitations for earning "6 figure[]" salaries by "becom[ing] a commercial specialist" and "learn[ing] investment real estate brokerage from

*the industry leader*," directing broker candidates to visit its "ccreflorida.com" website—all imbued with the infringing "CCRE" mark. *Id*. at ¶ 15. Indeed, these solicitations were independently received by numerous CBRE brokers who expressed concern about the potential for market confusion. *Id.* Capital Commercial should not be permitted to corrode CBRE's reputation by deceiving industry professionals into pursuing prospective careers with a company they falsely believe to be CBRE. Further, through correspondence leading up to this filing, Capital Commercial has signaled no intent to alter its behavior or remedy its infringing activities, and has instead resorted to dealing with CBRE in a derogatory and unprofessional manner. *Id*. at ¶¶ 22-25. Courts in this district routinely find irreparable harm under similar circumstances. *See It's A 10, Inc.*, 932 F. Supp. 2d at 1332-33 (finding irreparable harm when there is a "cognizable danger of future violations, given a party's past violations"); *Suzuki*, 2012 WL 640700, at *5 (recognizing irreparable harm when defendant is likely to offer inferior products under a confusing similar mark); *Ryder Sys., Inc.*, 2013 WL 3873231, at *7 (concluding that Plaintiff stands to be irreparably harmed by Defendant's misappropriation of Plaintiff's mark and insinuating a relationship between the companies when there is none, because such actions would "likely be devastating to Plaintiff's reputation and business," particularly given the poor customer reviews of the defendant).

Accordingly, CBRE will suffer irreparable harm unless an injunction is issued to prevent Capital Commercial's ongoing infringement and deceitful activities.

## C.  The Harm to Capital Commercial, if Any, is Decidedly Outweighed by Harm to CBRE

The injury to CBRE is vastly outweighed by any asserted injury to Capital Commercial. CBRE has invested hundreds of millions of dollars in advertising and promotion of its high-quality real estate and financial services offered under the CBRE Mark since at least 2003, including more

18

than \$200 million over the last three years alone. *See* SOF, ¶¶ 3, 8. Capital Commercial has operated its real estate business in South Florida using a non-infringing mark, website, and domain name for over a decade, and just recently adopted the confusingly similar mark and domain name. *See* SOF, ¶¶ 10, 12. Capital Commercial has thus built up no goodwill in its new mark and domain name and will suffer no hardship by reverting back to the mark and domain name it has operated under for years. *See E. Remy Martin & Co.*, 756 F.2d at 1534 (weighing the balance of harms in plaintiff's favor since defendant's business had survived for years prior to adopting the confusingly similar mark and it had little goodwill built up in the new mark); *Tally-Ho, Inc.*, 889 F.2d at 1029 ("The injury to [plaintiff] seems outweighed by any asserted injury to [defendant]. [Plaintiff's] four year investment in its course and trademark is subject to reputational and financial injury from [defendant's] infringing videocourse.").

Further, Capital Commercial will suffer no injury in the event of a preliminary injunction because it "has no right to engage in infringing activities" to begin with. *Suzuki*, 2012 WL 640700, at *5; *see also Gaffigan v. Does*, 689 F.Supp.2d 1332, 1341 (S.D. Fla. 2009) (finding that a plaintiff who had spent substantial time and money developing the quality and reputation of its marks would suffer substantial harm if the injunction was not granted, but a defendant who had no right to use the mark could suffer no legitimate hardship by being enjoined from using it). Even if Capital Commercial is enjoined, nothing is preventing it from developing, marketing, and selling its real estate services under a non-infringing mark and domain name. Indeed, it did so for many years without interference from CBRE. The sole activity that Capital Commercial will be prevented from doing is selling *infringing* services—"a loss which [it] may justifiably be called upon to bear." *Corning Glass Works v. Jeannette Glass Co.*, 308 F.Supp. 1321, 1328 (S.D.N.Y. 1970). The balance of harms tips clearly in favor of granting an injunction.

19

### D.  The Public Interest Favors Preliminary Injunction

Under the facts of this case, a preliminary injunction will indisputably serve the public interest. The Eleventh Circuit has explained that "the 'public interest relevant to the issuance of [an] . . . injunction is the public's interest in avoiding unnecessary confusion." *Angel Flight of Ga. v. Angel Flight Am., Inc.*, 522 F.3d 1200, 1209 (11th Cir. 2008); *see also Davidoff & Cie, S.A. v. PLD Int'l Corp.*, 263 F.3d 1297, 1304 (11th Cir. 2001) (finding that an injunction was "not adverse to the public interest, because the public interest is served by preventing consumer confusion in the marketplace."). In trademark cases, "the public as a whole has a paramount interest not to be confused by defendant's infringement" and "[t]he Court must give considerable weight to this public interest." *Nailtiques Cosmetic Corp. v. Salon Scis., Corp.*, No. 96-2709-CIV-NESBITT, 1997 WL 244746, at *5 (S.D. Fla. Jan. 10, 1997). By putting an end to Capital Commercial's deceptive practices that, as shown above, are likely to cause consumer confusion, injunctive relief will serve the public interest. There is also "a strong public interest in favor of protecting one's intellectual property pursuant to the trademark laws of the United States" and, as such, "it is no disservice, and is in fact a service, to the public interest" to grant injunctive relief to protect the CBRE Mark. *Suzuki*, 2012 WL 640700, at *5.

### V.   CONCLUSION

For the foregoing reasons, CBRE seeks a preliminary injunction against Capital Commercial to prevent its ongoing trademark infringement and related activities as set forth more fully in its proposed order.

Dated: June 14, 2019                             Respectfully submitted,

                                                 By:/s/ *Eric Boos*
                                                 Eric Boos
                                                 Florida Bar No. 107673
                                                 eboos@shb.com
                                                 **SHOOK, HARDY & BACON L.L.P.**
                                                 201 S. Biscayne Blvd., Ste. 3200
                                                 Miami, FL 33131-4310
                                                 Tel: 305-358-5171
                                                 Fax: 305-3587470

                                                 John D. Garretson (*pro hac vice*)
                                                 jgarretson@shb.com
                                                 Mark D. Schafer (*pro hac vice*)
                                                 mschafer@shb.com
                                                 **SHOOK, HARDY & BACON L.L.P.**
                                                 2555 Grand Blvd.
                                                 Kansas City, MO 64108
                                                 Tel: 816-474-6550
                                                 Fax: 816-421-5547

                                                 *Attorneys for Plaintiff*
                                                 *CBRE, Inc.*

21