UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 19-CIV-61235-RUIZ

**CBRE, INC.**,

    Plaintiff,

v.

**CAPITAL COMMERCIAL
REAL ESTATE GROUP, INC.**,

    Defendant.
_____/

**ORDER GRANTING PLAINTIFF'S MOTION FOR DEFAULT FINAL JUDGMENT**

**THIS CAUSE** comes before the Court upon Plaintiff's Motion for Default Final Judgment against Defendant Capital Commercial Real Estate Group, Inc. [ECF No. 15] ("Motion") filed on June 28, 2019. Having reviewed the docket, applicable affidavits, and the Motion, it is hereby

**ORDERED AND ADJUDGED** that Plaintiff's Motion is **GRANTED** for the reasons stated herein. Pursuant to Rule 58(a) of the Federal Rules of Civil Procedure, a Final Judgment will be entered by separate order.

**BACKGROUND**

    **I.    Factual Background**

Plaintiff is a commercial real estate service company with over 100 years of experience and over 200 offices, including nine in the State of Florida. Compl. ¶ 8. Plaintiff is also the owner of the following trademarks registered on the Principal Register of the United States Patent and Trademark Office (collectively, the "CBRE Trademarks"):

| Trademark | Reg. No./Reg. Date | Services | Date of First Use |
|---|---|---|---|
| **CBRE**<br><br>(for the letters "CBRE" in stylized form) | 4,161,000 / June 19, 2012 | Capital Investment Consultation Services; Financial Services In The Nature Of Commercial And Multi-Family Mortgage Banking And Loan Servicing, Mortgage Brokerage Services, Investment Consultation And Investment Management Of Funds Relating To Real Estate And Real Estate Companies; Residential And Commercial Real Estate Agency, Appraisal, Brokerage, Investment Ant) Management Services; Financial Analysis And Consultation Relating To Real Estate; Financial Valuation Of Real Estate; Financial Valuation Of Personal Property, Namely, Equipment; Financial Portfolio Management Of Residential And Commercial Real Estate; Financial Research, Management And Investment In The Area Of Residential And Commercial Real Estate, Namely, Research In The Field Of Acquisition And Disposition Of Real Estate, And Assets Management, Namely, Management Of Assets In The Form Of Real Estate Property, And Investment And Management Of Stock In Real Estate Companies That Hold, Manage, Buy And Sell Real Estate; Residential And Commercial Real Estate Facilities Management, Namely, Leasing Of Real Property, In Class 36 (U.S. Cls. 100, 101 And 102). | 07/2003 |
| **CBRE** | 2,925,943 / Feb. 8, 2005 | Capital Investment Consultation Services; Insurance Services, Namely, Insurance Underwriting And Consulting Services In The Field Of Property, General Liability Insurance; Financial Services In The Nature Of Commercial And Multi- | 11/2002 |

| | | | |
|---|---|---|---|
| | | Family Mortgage Banking And Loan Servicing, Mortgage Brokerage Services, Estate Planning; Investment Consultation And Investment Management Of Funds Relating To Real Estate And Real Estate Companies; Residential And Commercial Real Estate Agency, Appraisal, Brokerage, Investment And Management Services; Financial Analysis And Consultation Relating To Real Estate; Financial Valuation Of Real Estate; Financial Valuation Of Personal Property, Namely, Equipment; Financial Portfolio Management Of Residential And Commercial Real Estate; Financial Research, Management And Investment In The Area Of Residential And Commercial Real Estate, Namely, Research In The Field Of Acquisition And Disposition Of Real Estate, And Assets Management, Namely, Management Of Assets In The Form Of Real Estate Property, And Investment And Management Of Stock In Real Estate Companies That Hold, Manage, Buy And Sell Real Estate; Residential And Commercial Real Estate Facilities Management, Namely, Leasing Of Real Property, In Class 36 (U.S. Cls. 100, 101 And 102). | |
| **CBRE** | 2,925,952 / Feb. 8, 2005 | Residential And Commercial Real Estate Development; Residential And Commercial Real Estate Construction Services, Namely, Planning, Laying Out And Construction Of Residential And Commercial Real Estate; Residential And Commercial Real Estate Construction Management Services, In Class 37 (U.S. Cls. 100, 103 And 106). | 11/2002 |

*Id.* at ¶ 10. According to Plaintiff, these marks are "incontestable under 15 U.S.C. [section] 1065." *Id.* at ¶ 11. Since 2003, Plaintiff has used a "unique and distinctive logo" (as shown below) for its commercial business composed of the stylized trademarked letters "CBRE" in a dark green color against a white backdrop or vice versa ("CBRE Logo"). *Id.* at ¶ 12; *see also* CBRE Trademarks Number 4,161,0000.



Plaintiff also uses "www.cbre.us" as its domain name to direct consumers to its website where it uses the CBRE Logo as part of its website layout ("Trade Dress"). Plaintiff's Trade Dress combines "white or dark green horizontal banners at the top and bottom of its webpage that include white or dark green lettering" and the protected "CBRE" stylized lettering in the top banner. *Id.* at ¶ 13. According to Plaintiff's Complaint, its Trade Dress is "inherently distinctive" and "highly unique in the commercial real estate marketplace" and associated with Plaintiff's goodwill and reputation. *Id.* at ¶¶ 14-15, 40. In addition to its website, Plaintiff also advertises its properties and services in print media and social media. Correale Decl. ¶ 9, 12 [ECF No. 15].

Defendant is also a Florida commercial real estate company who is in direct competition with Plaintiff. *Id.* at ¶¶ 3, 16; *see also* Schafer Decl. [ECF No. 10-2] ¶ 10. For over a decade, Defendant has used the domain name "capitalcomgroup.com" for its website, "which displayed the name 'Capital Commercial Real Estate Group' in *white lettering against a blue background* with images of skyscrapers." Compl. ¶ 16 (emphasis added); *see also* Schafer Decl. ¶¶ 11-13. Although Defendant's website has changed over time, the website consistently featured white lettering, a blue background, and images of skyscrapers. Schafer Decl. ¶¶ 11-13. Defendant advertises its properties for sale or lease on its website and on advertises through various social media platforms and the newspaper. Correale Decl. ¶¶ 11-12.

Sometime after January 2019, Defendant changed its website's domain name to "ccreflorida.com" and redesigned its website layout. Compl. ¶ 21. As shown below, Defendant incorporated a logo "bearing white 'CCRE' letters against a dark green backdrop, and a logo bearing dark green 'CCRE' letters against a white backdrop" into its website and marketing materials.



Compl. ¶¶ 16-17; Letter from Plaintiff's General Counsel dated February 7, 2019 [ECF No.10-2-O]. According to Plaintiff, Defendant's new website uses "very similar[,] if not identical[,] color schemes and fonts to those protected by [Plaintiff's] trademarks and Trade Dress." Compl. ¶ 17. In fact, a side-by-side comparison of Plaintiff's CBRE Logo and Defendants redesigned logo "illustrates the similarities between the respective marks."

| Plaintiff's Logo | Defendant's Redesigned Logo |
|---|---|
| CBRE | CCRE<br>CAPITAL COMMERCIAL REAL ESTATE GROUP, INC. |

*Id.* at ¶ 20. Plaintiff maintains that Defendant uses its redesigned logo on its website and "in print and online advertisements and signage." *Id.* at ¶ 17. Plaintiff claims that Defendant made these

revisions to "increase consumer traffic and direct consumers away from Plaintiff's website to its own website." *Id*. at ¶ 21. Plaintiff also alleges that Defendant's "redesigned materials creates and reinforces consumers associations between [Plaintiff and Defendant], despite the two companies having no actual business association." *Id*. at ¶ 17.

According to Plaintiff's Complaint, Defendant also used its redesigned logo as a header in a solicitation sent to numerous commercial brokers. *Id*. at ¶ 19; Correale Decl. ¶ 13. Defendant's solicitations were "independently received" by several brokers employed by Plaintiff who expressed concern about the "potential for market confusion and [Defendant's] attempt to capitalize on the reputation and goodwill of [Plaintiff]." Correale Decl. ¶ 13.

On February 7, 2019, Plaintiff's General Counsel sent a letter to Defendant's Registered Agent demanding Defendant cease from using its redesigned logo. Compl. ¶ 23; *see also* Schafer Decl. ¶ 17; Letter from Plaintiff's General Counsel dated February 7, 2019. After receiving no response from Defendant, Plaintiff's outside counsel sent a *second* letter demanding Defendant cease and desist from using its redesigned logo. Schafer Decl. ¶ 18; Letter from Shook Hardy & Bacon dated April 3, 2019 [ECF No. 10-2-P]. The second letter included information about Plaintiff's CBRE Trademarks, and therefore, Plaintiff alleges it sufficiently notified Defendants of Plaintiff's "federal and state law claims for trademark infringement, trade dress infringement, and unfair competition." *Id.*; Compl. ¶ 24. Because Plaintiff did not hear from Defendant and Defendant continued to use its redesigned logo, Plaintiff filed a Complaint [ECF No. 1] against the Defendant.[1] In response, Defendant's Registered Agent contacted Plaintiff's counsel via email

---

[1] Plaintiff's outside counsel also sent Defendant's Registered Agent a third letter on May 16, 2019, explaining it filed a Complaint before the Court "for trademark infringement and related actions against the Defendant." It asked Defendant to contact Plaintiff's outside counsel if it wished to resolve this matter outside of litigation by May 24, 2019. Schafer Decl. ¶ 20; Letter dated May 16, 2019 [ECF No. 10-2-R].

to notify counsel it "changed [their] logo to show a major difference from [Plaintiff] and that the logo matches the exact name of [Defendant's] company." Schafer Decl. ¶ 19; Email Exchange with Defendant dated May 2019 [ECF No. 10-2-Q]. The header on the email from Defendant's Registered Agent (shown below) displays the alleged changes made to Defendant's logo.



*Id.* The only changes between Defendant's first redesigned logo and its second redesigned logo is the inversed color scheme, the additional "G," and the color change of Defendant's company name from white to black. In response to Defendant's Registered Agent's email, Plaintiff's counsel reiterated their demand for Defendant to stop using the "CCRE or CCREG logo and the ccreflorida.com domain or any similar logos or domains." *Id.*

Defendant's Registered Agent contacted Plaintiff's counsel on May 30, 2019, indicating he thought he complied with Plaintiff's demands. Schafer Decl. ¶ 21; Email Exchange dated May 20-May 31 [ECF No. 10-2-S]. In response, Plaintiff's counsel expressed their disagreement and stated that Defendant's "sudden change" of its logo and color scheme was a "clear attempt to free-ride on [Plaintiff's] goodwill and confuse consumers . . . ." *Id.*

After forwarding Plaintiff's Motions for Pro Hac Vice [ECF Nos. 6, 7] to Defendant's Registered Agent, he responded to Plaintiff's counsel using a letterhead containing the second redesigned logo and a *second* revised domain name ("www.ccreg.us"). Schafer Decl. ¶¶ 14, 22; Email Exchange dated June 5-June 12 [ECF No. 10-2-T]. Therefore, Defendant changed its domain name sometime after it received notice from Plaintiff's counsel of its alleged infringement from "www.creflorida.com" to "www.ccreg.us." *Id.*; Email Exchange with Defendant dated May 2019. Notably, Plaintiff's domain name remains "www.cbre.us." Schafer Decl. ¶ 15.

## II.  Procedural History

Plaintiff filed its Complaint against Defendant on May 15, 2019, alleging federal and common law trademark infringement, trade dress infringement, false designation of origin, unfair competition, and deceptive and unfair trade practices. Compl. ¶ 1. Plaintiff perfected service of process on Defendant on May 29, 2019. *See* Return of Service [ECF No. 5]. Defendant's response or answer to Plaintiff's Complaint was due on June 19, 2019. *See* FED. R. CIV. P. 12(a)(1)(A). To date, Defendant has not responded to the Complaint or otherwise made an appearance in this action. Therefore, Defendant had actual notice of the lawsuit and chose not to respond.

Because of Defendant's failure to respond to its Complaint, Plaintiff filed a Motion for Clerk's Entry of Default [ECF No. 12] on June 25, 2019; the Clerk entered a default on the same day. On June 28, 2019, Plaintiff filed the Motion before the Court seeking a permanent injunction against the Defendant for the alleged trademark infringements and other violations of law.

## **LEGAL STANDARD**

A party may apply to the court for a default judgment when the defendant fails to timely respond to a pleading. FED. R. CIV. P. 55(b)(2). "A defendant, by his default, admits the plaintiff's well-pleaded allegations of fact, is concluded on those facts by the judgment, and is barred from contesting on appeal the facts thus established." *Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc.*, 561 F.3d 1298, 1307 (11th Cir. 2009) (internal quotations omitted) (quoting *Nishimatsu Const. Co. v. Houston Nat'l Bank*, 515 F.2d 1200, 1205 (5th Cir. 1975)). However, conclusions of law are to be determined by the court. *Mierzwicki v. CAB Asset Management LLC*, No. 14-61998, 2014 WL 12488533, at *1 (S.D. Fla. Dec. 30, 2014) (citation omitted). Therefore, a court may only enter a default judgment if there is a "sufficient basis to state a claim." *Id*.

Once a plaintiff has established a sufficient basis for liability, the Court must conduct an inquiry to determine the appropriate damages. *PetMed Express, Inc. v. MedPets.Com, Inc.*, 336 F. Supp. 2d 1213, 1217 (S.D. Fla. 2004) (citation omitted). Although an evidentiary hearing is generally required, the Court need not conduct such a hearing "when . . . additional evidence would be truly unnecessary to a fully informed determination of damages." *Safari Programs, Inc. v. CollectA Int'l Ltd.*, 686 F. App'x 737, 746 (11th Cir. 2017). Therefore, where the record adequately supports the award of damages, an evidentiary hearing is not required. *See SEC v. Smyth,* 420 F.3d 1225, 1232 n.13 (11th Cir. 2005); *see also PetMed Express*, 336 F.Supp.2d at 1217, 1223 (finding an evidentiary hearing unnecessary because plaintiff was seeking statutory damages under the Lanham Act); *Luxottica Group S.p.A. v. Casa Los Martnez Corp.*, No. 14-22859, 2014 WL 4948632, at *2 (S.D. Fla. Oct. 2, 2014) (same).

## ANALYSIS

### I. Basis for Entering a Default Judgment

#### A. Count I and Count IV: Infringement of Registered Trademarks

According to Plaintiff, Defendant committed trademark infringement in violation of the Lanham Act,15 U.S.C. section 1114, and Florida common law. "The analysis of liability for Florida common law trademark infringement is the same as under the Lanham Act." *PetMed Express, Inc.*, 336 F. Supp. 2d at 1218 (citing *Gift of Learning Found, Inc. v. TGC, Inc.*, 329 F.3d 792, 802 (11th Cir. 2003)). Therefore, a plaintiff demonstrates federal and common law trademark infringement if and only if it establishes: (1) its mark has priority; (2) defendant used its mark in commerce; and (3) defendant's mark is likely to cause consumer confusion. *Int'l Cosmetics Exch., Inc. v. Gapardis Health & Beauty, Inc.*, 303 F.3d 1242, 1248 (11th Cir. 2002); *Frehling Enters., Inc. v. Int'l Select Group, Inc.*, 192 F.3d 1330, 1335 (11th Cir. 1999).

"The owner of a registered mark . . . enjoys the unlimited right to use the mark nationwide, and federal registration affords the registrant priority over all future users of confusingly similar marks." *Tana v. Dantanna's*, 611 F.3d 767, 780 (11th Cir. 2010). Because Plaintiff registered the stylized "CBRE" with the U.S. Trademark Office on June 19, 2012, it takes priority over all future users of confusingly similar marks, including Defendant who did not redesign its logos till sometime after January 2019. Therefore, Plaintiff has sufficiently demonstrated its CBRE Trademarks, including the stylized "CBRE" lettering, takes priority over Defendant's redesigned logos.

Plaintiff claims Defendant used its revised logos as part of a solicitation to commercial brokers; on its website; in print and online advertisements; and signage. Taking the factual allegations in Plaintiff's Complaint as true, there is little doubt that Defendant used its redesigned logo in commerce.

To determine whether Defendant's mark is likely to cause consumer confusion, the Court considers seven factors: (1) type of mark; (2) similarity of the parties' marks; (3) similarity of the products the marks represent; (4) similarity of the parties' trade channels and customers; (5) similarity of advertising media; (6) defendant's intent; and (7) evidence of actual confusion in the marketplace. *See Frehling Enters., Inc.*, 192 F.3d at 1335. Neither factor is dispositive, but "the type of mark and the evidence of actual confusion are the most important." *Id.*[2]

---

[2] In determining the likelihood of confusion, the Court rests its decision on the following five factors: (1) the type of mark; (2) the similarity of the parties' mark; (3) similarity of the products the marks represent; (4) the similarity of advertising media; and (5) defendant's intent. The Court need not review the remaining factors because the five factors overwhelmingly demonstrate a likelihood of confusion. *PlayNation Play Sys., Inc. v. Velex Corp.*, 924 F.3d 1159, 1169 (11th Cir. 2019) ("Courts do not have to consider every factor in every case."). However, the Court notes that Plaintiff concedes it does not have evidence of actual confusion. Mot. Preliminary Inj. at 15. Nonetheless, Plaintiff need not show *actual* confusion to succeed on the merits. *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 978 (11th Cir.1983) ("Although evidence of actual

### i. *Type of Mark*

"Classifying the type of mark Plaintiff has determines whether it is strong or weak. The stronger the mark, the greater the scope of protection accorded it, the weaker the mark, the less trademark protection it receives." *Id.* (citing *John H. Harland Co.*, 711 F.2d at 973). "Trademark law distinguishes four gradations of distinctiveness of marks, in descending order of strength: fanciful or arbitrary, suggestive, descriptive, and generic." *Jysk Bed'N Linen v. Dutta-Roy*, 810 F.3d 767, 778 (11th Cir. 2015). An arbitrary mark is deserving of the most protection because it is a mark that "bears no relationship to the product" or service it identifies. *Frehling Enters., Inc.*, 192 F.3d at 1335-36. To determine the type of mark at issue, the Court assess three factors: (1) the relationship between the mark and the nature of the service; (2) the nature and extent of any third-party use; and (3) whether the mark has been made incontestable. *Id*

Plaintiff's CBRE Logo and CBRE Trademarks "offers no descriptive, or even suggestive information [and] bears no relation to the service it identifies." Mot. Preliminary Inj. at 10. Plaintiff does not authorize any third party to use the CBRE Logo or CBRE Trademarks and is unaware of any other unlicensed use of its marks. Correale Decl. ¶ 13. And lastly, the Complaint alleges that the CBRE Trademarks are incontestable. The Court finds Plaintiff has provided a sufficient basis for the Court to classify the CBRE Logo and the CBRE Trademarks as an arbitrary mark and therefore, it is entitled to the strongest protections.

### ii. *Similarity of the Parties Mark*

When comparing the similarity between Plaintiff's CBRE Logo and CBRE Trademarks against Defendant's first and second redesigned logos, the Court "considers the overall

---

confusion is not necessary to a finding of likelihood of confusion, it is nevertheless the best evidence of likelihood of confusion.") (internal quotation marks omitted).

impressions that the marks create, including the sound, appearance, and manner in which they are used." *PlayNation Play Sys., Inc.*, 924 F.3d at 1168 (quoting *Frehling Enters., Inc.*, 192 F.3d at 1337). "The greater the similarity, the greater the likelihood of confusion." *Fla. Int'l Univ. Bd . of Trustees v. Fla. Nat'l Univ. Inc.*, 830 F.3d 1242, 1260 (11th Cir. 2016). "Two marks need not be identical to support a finding of infringement, and the key question [is] whether the marks are sufficiently similar to deceive the public." *Id.* (internal quotation and citation omitted).

The similarities between Plaintiff's CBRE Logo and Defendant's first and second redesigned logos are remarkable. When comparing Plaintiff's logo to Defendant's first revised logo, the two marks are almost indistinguishable. Both logos are essentially the same colors, same typeface, and almost the same letters. When considering Defendant's second redesigned logo, the similarities are still extraordinary—the color scheme is essentially the same and the stylistic font is very similar. Adding the "G" to the second redesigned logo "does not materially change the overall impression created by the mark . . . ." Mot. Preliminary Inj. at 12. Although the marks are not absolutely identical, the Court finds that the marks at issue "are sufficiently similar to deceive the public." Therefore, Plaintiff has provided a sufficient basis for determining the astounding similarity between its CBRE Logo and Defendant's revised logos.

### iii. *Similarity of Products*

"The test for similar products is 'whether the products are the kind that the public attributes to a single source, not whether or not the purchasing public can readily distinguish between the products of the respective parties.'" *PlayNation Play Sys. Inc.*, 924 F.3d at 1168 (quoting *Frehling Enters., Inc.*, 192 F.3d at 1338). The threshold question is "whether the goods are so related that a consumer would believe that a single producer made both." *Id.* (quoting *E. Remy Martin & Co., S.A. v. Shaw-Ross Int'l Imports, Inc.*, 756 F.2d 1525, 1530 (11th Cir. 1985)); *see also Liquidators,*

*Inc. v. Premier Chrysler, Jeep, Dodge, LLC*, 605 F.3d 931, 940 (11th Cir. 2010) ("At the least, the similarities between the two sales allow for the inference that "a reasonable consumer could possibly attribute the products here to the same source.").

Both Plaintiff and Defendant offer commercial real estate services in Florida. In fact, Plaintiff alleges that Defendant is its direct competitor. Because of this, the Court finds that a "reasonable consumer could possibly attribute the products here to the same source." Therefore, Plaintiff has provided a sufficient basis to establish a similarity between the products offered by Plaintiff and Defendant.

> *iv.* **Similarity of Advertising Channels**

The standard for determining the similarity of advertising media is "whether there is likely to be a significant enough overlap in the readership of the publications in which the parties advertise that a possibility of confusion could results." *PlayNation Play Sys., Inc.*, 924 F.3d at 1168-69. "If a plaintiff and a defendant both use the same advertising media, a finding of likelihood of confusion is more probable." *Turner Greenberg Assoc., Inc., v. C & C Imports, Inc.*, 320 F. Supp. 2d 1317, 1332 (S.D. Fla. 2004) (citing *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1542 (11th Cir. 1986)).

With the exception of newspaper advertisement, Plaintiff and Defendant use the same advertising channels to market their essentially identical services in the same geographical location. Consequently, the Court finds there is a "significant enough overlap in the readership of the [parties] publications." Thus, Plaintiff has demonstrated a sufficient basis to determine the similarity between Plaintiff's and Defendant's advertising channels.

> *v.* **Defendant's Intent**

When considering Defendant's intent, the Court must determine "whether a defendant

adopted a plaintiff's mark with the intention of deriving a benefit from the plaintiff's business reputation." *TracFone Wireless, Inc. v./ Pak China Group Co. Ltd.*, 843 F. Supp. 1284, 1296 (S.D. Fla. 2012) (quoting *Frehling Enters., Inc.*, 192 F.3d at 1340). If the defendant intended to derive benefit from the plaintiff's trademark, "a likelihood of confusion can be found as a matter of law." *Babbit Electronics, Inc. v. Dynascan Corp.*, 38 F.3d 1161, 1179 (11th Cir. 1994).

Because the Court must take Plaintiff's factual allegations as true, Defendant made the revisions to its logo and website to increase consumer traffic; direct consumers away from Plaintiff's website; and create and reinforce consumer's associations between the Plaintiff and Defendant, despite the two companies having no actual business associations. As a result, the Court finds Defendant redesigned its logos with the intention to derive a benefit from Plaintiff's business reputation.

Based on the five factors considered by the Court, Plaintiff has provided a sufficient basis to establish the likelihood of confusion between Plaintiff's CBRE Logo and Defendant's revised logos. Because Plaintiff satisfied the last element of federal and common law trademark infringement, the Court may enter a default final judgment against Defendant for Count I and Count IV of the Complaint.

### B. Count II and Count IV: False Designation and Trade Dress Infringement

Plaintiff alleges Defendant's use of its new logos and revised website design (including the font and color schemes described above) amount to false designation of origin and trade dress infringement in violation of section 43(a) of the Lanham Act, 15 U.S.C section 1125(a) and common law. Although some courts use the terms interchangeably, trade dress infringement is technically a subset of false designation of origin. *Hyman v. Nationwide Mut. Fire Ins. Co.*, 304 F.3d 1179, 1186 n.6 (11th Cir. 2002). Nonetheless, both causes of action use the same test as

trademark infringement: whether the alleged infringement will likely cause consumer confusion. *Id.* ("[R]egardless of its name, the central concern in a § 43(a) case is whether the public is likely to be confused as to the manufacturer, attributes, or origin the of the product."); *see also Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 780 (1992) ("Whether we call the violation infringement, unfair competition or false designation of origin, the test is identical—is there a 'likelihood of confusion?'").

Plaintiff's Trade Dress combines the protected "CBRE" stylized lettering, dark green letters against a white backdrop (and vice versa), white or dark green horizontal banners, and the CBRE Logo. Because the test for trade dress infringement mirrors the test for federal and common law trademark infringement, and the Court has already determined that a sufficient basis exists for trademark infringement, the Court finds the Defendant is also liable for false designation of origin and trade dress infringement. Therefore, a default final judgment may be entered against Defendant for Count II and Count IV.

### C. Count III: Cybersquatting

"The Cyberpiracy prevention section of the Lanham Act, 15 U.S.C. § 1125(d), makes a person liable for the 'bad faith intent to profit' from a protected mark by using a domain name that is identical or confusingly similar." *PetMed Express, Inc.*, 336 F. Supp. 2d at 1218. "[C]ybersquatting occurs when the cybersquatter intends to profit by diverting customers from the website of the trademark owner to the defendant's own website, where those consumers would purchase the defendant's products or services instead of the trademark owner's. In a sense, the cybersquatter muddies the clear pool of the trademark owner's goodwill and then profits off the resulting murkiness." *Jysk Bed'N Linen*, 810 F.3d at 775 (internal quotations and citations omitted). For a plaintiff to successfully establish a claim for cybersquatting, the plaintiff must

Page **15** of **20**

prove the defendant had "bad faith intent to profit from that mark" and defendant registered, used, or trafficked in "a domain name that is identical or confusingly similar to a distinctive mark." *Id.*

Plaintiff's domain name is "cbre.us." According to Plaintiff, Defendant, changed its domain name from "capitalcomgroup.com" "to "ccreflorida.com" and later to, "ccreg.us.com." Plaintiff claims Defendant made these revisions to increase consumer traffic and direct consumers away from Plaintiff's website to its own website. The Court has already established that Plaintiff's CBRE Logo is an arbitrary mark—the most distinct—and entitled to the highest degree of protection. The Court also has determined that Defendant acted with the intention to derive a benefit from Plaintiff's business reputation. And lastly, there is no serious doubt that Defendant's new domain names, especially the most recent domain name, "www.cccreg.us," are confusingly similar to Plaintiff's arbitrary and protected "CBRE" lettering. Therefore, Plaintiff has provided a sufficient basis to establish that Defendant is liable for cybersquatting in violation of the Lanham Act and a default final judgment may be entered as to Count III.

### D. Count V: Common Law Unfair Competition

To prevail on a Florida common law unfair competition claim based on trademark infringement, a plaintiff must prove that (1) the plaintiff's mark has priority, (2) the trade name or service mark is arbitrary or suggestive or has acquired secondary meaning, (3) the defendant's mark is "confusingly similar . . . to indicate or identify similar services rendered (or similar goods marketed) by it in competition with plaintiff in the same trade area in which plaintiff has already established its trade name or service mark," and (4) a likelihood of consumer confusion. *PetMed Express Inc.*, 336 F. Supp. 2d at 1219 (citing *American United Life Ins. Co. v. American United Ins. Co.*, 731 F. Supp. 480, 486 (S.D. Fla. 1990)).

Plaintiff clearly is the prior user of the CBRE Logo (and CBRE Trademarks) because it

started using the CBRE Logo in 2003, and Defendant did not redesign its logos until sometime after January 2019. Therefore, Plaintiff's mark has priority. The Court has already established that Plaintiff's CBRE Logo and CBRE Trademarks are arbitrary. According to Plaintiff, its CBRE Logo and Defendant's redesigned logos are used to market and advertise similar (if not the same) commercial real estate services in South Florida. And lastly, the Court has already determined that Defendant's redesigned logos are likely to cause consumer confusion. Therefore, Plaintiff has provided a sufficient basis for the Court to enter a default final judgment against Defendant as to Count V.

### E. Count VI: FDUPTA

"[Florida's Deceptive and Unfair Trade Practices ("FDUPTA")] makes illegal '[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce . . . .'" *Suntree Tech., Inc. v. Ecosense Intern., Inc.*, 693 F.3d 1338, 1345 (11th Cir. 2012) (citations omitted). "The purpose of FDUPTA is '[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce.'" *Id.* (quoting Fla. Stat. § 501.202(2)). FDUPTA claims alleging infringement are governed by the same legal standard as claims brought under section 43(a) of the Lanham Act. *Id.*

Given that Plaintiff has established a sufficient basis for trademark infringement, and the same legal standard applies in FDUPTA cases, the Court may enter a default final judgment against Defendant as to Count VI.

## II. Permanent Injunction

Because the Court has established liability as to all counts in Plaintiff's Complaint, the Court must conduct its inquiry as to Plaintiff's remedy. Pursuant to 15 U.S.C. section 1116(a)

Plaintiff is statutorily entitled to injunctive relief if the Plaintiff succeeds on the merits of its claim and if the equities involved favor injunction. *See* 15 U.S.C. § 1116(a). To determine if the equities favor an injunction, the Plaintiff must prove (1) an irreparable injury; (2) the inadequacy of remedies at law, such as monetary damages; (3) the balance of hardship tips in favor of a remedy in equity; and (4) it is best for the public's interest. *eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006).

In trademark cases, "a sufficiently strong showing of likelihood of confusion . . . may by itself constitute a showing of a substantial threat of irreparable harm." *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998). In its Complaint, Plaintiff discusses at length the irreparable harm caused by Defendant's infringement. Compl. ¶¶ 26-29. Plaintiff alleges that the "longstanding association" of CBRE Trademarks and CBRE Logo to Plaintiff's goodwill and reputation will be "substantially diminished and eroded if [Defendants] continues to use its redesigned logos and trade dress." Compl. ¶¶ 26, 29. This, coupled with the Court's determination that the Defendant's use of its redesigned logos and trade dress will likely cause consumer confusion, demonstrates a substantial threat of irreparable harm.

"Injunctive relief is the remedy of choice for trademark and unfair competition cases, since there is no adequate remedy at law for the injury caused by a defendant's continuing infringement." *Burger King Corp. v. Agad*, 911 F.Supp. 1499, 1509-10 (S.D. Fla. 1995) (citing *Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1180 (9th Cir. 1988)); *see also Chanel, Inc. v. Sea Hero*, 234 F. Supp. 3d 1255, 1262 (S.D. Fla. 2016) ("An award of monetary damages alone will not cure the injury to Plaintiff's reputation and goodwill that will result if Defendants' infringing and counterfeiting actions are allowed to continue."). Plaintiff asserts that monetary damages are insufficient. Compl. ¶ 29. Plaintiff claims its only adequate remedy is a permanent injunction

prohibiting Defendant from "capturing profits and goodwill from the CBRE [T]rademarks and [T]rade [D]ress." *Id.* Because of past precedent and Plaintiff's allegations, the Court finds the only appropriate remedy available is injunctive relief.

On balance, Plaintiff undoubtedly has more to lose if Defendant continues to infringe on its CBRE Logo, CBRE Trademarks, and Trade Dress. Plaintiff started using its CBRE Logo over a decade ago and consumers have reasonably associated Plaintiff with its protected marks. Plaintiff's risk of mistake and deception to its consumers is especially high given the significant likelihood of confusion. Contrastingly, Defendant hardly faces any hardship. Not only are Defendant's acts prohibited by law, but Defendant's new logos were recently implemented. Therefore, the Court finds the scales tip in favor of injunctive relief.

Lastly, it is in the public interest to prevent consumers from being misled. *See Chanel, Inc.*, 234 F. Supp. 3d at 1262 (citation omitted). Because Plaintiff has satisfied its burden in seeking a permanent injunction, the Court finds the equities involved favor injunctive relief.

## CONCLUSION

Plaintiff has provided a sufficient basis for all six counts of its Complaint: (1) federal trademark infringement; (2) federal trade dress infringement and false designation of origin; (3) cybersquatting; (4) common law trademark infringement and trade dress infringement; (5) common law unfair competition; and (6) FDUPTA. Plaintiff is also statutorily and equitably entitled to a permanent injunction. Based on the foregoing, it is hereby

**ORDERED AND ADJUDGED** as follows:

1. Plaintiff's Motion for Default Final Judgment [ECF No. 55] is **GRANTED**.

2. Pursuant to Rule 58(a) of the Federal Rules of Civil Procedure, a Final Default Judgment will be entered by separate order.

**DONE AND ORDERED** in Fort Lauderdale, Florida this 31st day of July, 2019.

_____
**RODOLFO RUIZ
UNITED STATES DISTRICT JUDGE**